2026 IL App (1st) 252106-U

FIRST DISTRICT,
SIXTH DIVISION
June 26, 2026

No. 1-25-2106

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* A.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County, Illinois |
| (The People of the State of Illinois, | ) | Juvenile Justice and |
| | ) | Child Protection Department, |
| Petitioner-Appellee, | ) | Child Protection Division. |
| | ) | |
| v. | ) | Nos. 23 JA 109 |
| | ) | |
| Brianna C. | ) | The Honorable |
| | ) | Jennifer Payne, |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Presiding Justice C.A. Walker and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1     *Held*:  We affirm the trial court's parental unfitness and best interest findings because they are not against the manifest weight of the evidence and the court did not violate appellant's due process rights.

¶ 2     Respondent Brianna C., the biological mother of the minor A.C., appeals from the trial court's order finding her to be an unfit parent, terminating her parental rights, and appointing the Department of Children and Family Services (DCFS) guardianship administrator as guardian

with the right to consent to A.C.'s adoption. The court also found A.C.'s father unfit and terminated his parental rights. On appeal, Brianna contends the trial court's unfitness and best interest determinations are against the manifest weight of the evidence and that her due process rights were violated. We disagree and affirm.

¶ 3                                 I. BACKGROUND

¶ 4        A.C. was born on January 25, 2023, placed in protective custody five days later, and moved to the care of non-relative foster parents. On February 1, 2023, the State filed a petition for adjudication of wardship and temporary custody, alleging Brianna's two older children, Ad. C. and Ar. C., were already in DCFS custody with findings of abuse and neglect. An April 2022 parenting capacity assessment (PCA) raised concerns about Brianna's "ability to parent her children safely and independently." Temporary custody was granted to the DCFS guardianship administrator with the right of placement.

¶ 5        On June 26, 2023, the trial court adjudged A.C. neglected due to an injurious environment and abused due to a substantial risk of physical injury. The court relied on Brianna's false claim that she was A.C.'s surrogate, her unresolved service needs for her older children, and her cognitive and developmental delays affecting her ability to parent.

¶ 6        On July 21, 2023, the court entered a dispositional order finding Brianna unable, for reasons other than financial circumstances alone, to care for, protect, train, or discipline A.C. The court placed A.C. in the custody of the DCFS guardianship administrator with the right of placement and entered a permanency goal of return home within 12 months. On February 14, 2025, the permanency goal was changed to substitute care pending a termination determination.

¶ 7        On March 5, 2025, the State filed a supplemental petition to terminate Brianna's parental rights and appoint a guardian with the right to consent to A.C.'s adoption. The State alleged

Brianna was unfit based on her failure to maintain a reasonable degree of interest, concern, or responsibility as to A.C.'s welfare (750 ILCS 50/1 D(b) (West 2024)) and her failure to make reasonable efforts and/or reasonable progress towards return home within any 9-month statutory period: June 27, 2023, to March 27, 2024; March 28, 2024, to December 28, 2024; and July 29, 2024, to April 29, 2025. See 750 ILCS 50/1 D(m) (West 2024).

¶ 8                                    A. Fitness Hearing

¶ 9        The termination hearing occurred on July 28, September 19, and September 24, 2025. The court admitted Brianna's therapy records from Chatham Family Counseling (Chatham), October 30, 2024 orders terminating Brianna's rights to Ad. C. and Ar. C., and a certified February 2022 Delwe Psychological Services PCA and psychological evaluation assessing Brianna's parenting abilities in light of her developmental disabilities, depression, and bipolar disorder. These certified records were admitted over Brianna's hearsay objection.

¶ 10        DCFS caseworker Andrea Gray, assigned from January 2023 to April 2024, testified that Brianna was reassessed through an integrated assessment and recommended for counseling, developmental disability services, and domestic violence services. Brianna completed domestic violence services in November 2023. A Nurturing Parenting Program (NPP) was recommended "at an appropriate time," but never deemed appropriate during Gray's tenure.

¶ 11        Brianna engaged intermittently in individual therapy and psychiatric monitoring through Chatham. She completed intake on February 22, 2023, but was unsuccessfully discharged on August 8, 2023, after missing three appointments. Brief re-engagement in August and September 2023, was followed by another unsuccessful discharge in December 2023. After Chatham shifted to a self-referral system, Brianna re-referred in February 2024.

¶ 12 Brianna was also recommended to self-refer for developmental disability services through the Department of Human Services (DHS). Gray obtained Brianna's Individualized Education Plan (IEP), called DHS with her, and provided all required documents to Brianna, but Brianna never followed through.

¶ 13 Brianna attended 90% of weekly supervised visits with A.C., but "always need[ed] hands-on help" and "wasn't really able to do any parenting independently." Unsupervised visits were not recommended due to "concerns that [Brianna] wouldn't be able to keep [A.C.] safe."

¶ 14 When caseworker Tiara Davis took over in April 2024, Brianna still needed to complete the NPP and individual therapy. Chatham records show Brianna re-engaged in therapy on February 1, 2024. She attended a total of three sessions in February and March 2024, but was discharged on April 14, 2024, for missed appointments and failure to verify insurance. In May 2024, Brianna said she would find her own provider but did not begin therapy at Oak Street Health until January 2025 and stopped in April 2025. She never re-engaged thereafter or self-referred to DHS. Davis offered to help call DHS, but Brianna declined.

¶ 15 Brianna began the NPP in October 2024 and completed all components except the observation session with A.C. Her midpoint report (December 2024–March 2025) reflected "low to moderate" participation, average discipline skills, and below-average scores in empathy, expectations, family roles, and power and independence. The observation component could not be completed due to inconsistent visits.

¶ 16 Although weekly supervised visits were permitted, Brianna visited biweekly or monthly instead. Her transportation provider dropped her after repeated cancellations. Even with a new transportation provider, visits remained inconsistent, and Brianna attended only 30–40% of visits from April to November 2024. She did not visit A.C. in April, May, August, or September 2024,

or from December 2024 through January 2025. Unsupervised visits remained unwarranted due to her limited parenting capacity.

¶ 17     Brianna testified she attended therapy at Oak Street Health from November 2024 through June 2025 and attempted multiple times to contact DHS, but the "line [was] dead." She reported going to DHS in person in June 2025 but could not specify the date.

¶ 18     Brianna testified that she visited A.C. in April and May 2024. Photos from three May 2024 visits were admitted, and the State stipulated that those visits occurred. Brianna last visited A.C. in March 2025 and again two weeks before the July 2025 termination hearing. Visits between March and July were canceled due to Brianna or A.C. being sick or traveling.

¶ 19     The trial court found Brianna made reasonable efforts and progress from June 27, 2023, to March 27, 2024, when she engaged in services and attended 90% of visits. However, Brianna failed to make reasonable progress from March 28, 2024 to December 28, 2024 and July 29, 2024 to April 28, 2025. The court emphasized that Brianna was never approved for unsupervised visitation, attended only 30–40% of visits under Davis, and went months without visiting. Her explanations did not justify long stretches of non-visitation. She also failed to complete the NPP observation or maintain consistent therapy.

¶ 20     As to ground (b), the court found Brianna lacked responsibility despite showing interest and concern, due to extended periods of missed visits and failure to engage in services.

¶ 21                             B. Best Interest Hearing

¶ 22     At the best interest hearing, caseworker Davis testified that A.C. had lived with foster parents Jennifer and Eric since infancy, was strongly bonded to them, and called them mom and dad. Their home was safe and appropriate. Although A.C. continued to call Brianna "mom,"

Brianna had not completed required services despite the length of the case. Davis recommended termination.

¶ 23    Jennifer testified that A.C. is strongly bonded to her, Eric, and their extended families. She an Eric preferred adoption over guardianship because guardianship gives "more power" and "more say" to the biological family. They intended to continue monthly visits with A.C.'s siblings and welcomed ongoing contact between A.C. and Brianna.

¶ 24    Brianna testified that she wants to remain in A.C.'s life and is worried about not being able to see A.C. if her rights were terminated.

¶ 25    In finding it in A.C.'s best interest to terminate Brianna's parental rights, the court noted that A.C. is strongly bonded to her foster parents, who have provided a safe home for her and have ensured all her needs are met since she was five days old. A.C.'s foster parents are dedicated to maintaining her connection with her biological family; they plan to keep up monthly visits with A.C.'s siblings and Brianna. Although "the KIND Act puts guardianship and adoption on an even playing field ***," guardianships can always be vacated. The court found it in A.C.'s best interest "to have *** a permanent family especially *** [one that] is open to [her] knowing her biological family." It therefore terminated Brianna's parental rights and appointed the DCFS guardianship administrator with authority to consent to adoption. Brianna appeals.

¶ 26                                    II. ANALYSIS

¶ 27                              A. Fitness Determination

¶ 28    Brianna argues the trial court's unfitness finding is against the manifest weight of the evidence because certain services were "never available to her" and it was decided on improper hearsay in the certified Delwe PCA and psychological evaluation. We disagree with both contentions.

¶ 29        Parental rights may be involuntarily terminated only where the court first determines by clear and convincing evidence that the parent is an "unfit person" under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). 705 ILCS 405/2-29(2) (West 2024). Under section 1(D)(m), a parent is "unfit" when they fail "(i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor" or "(ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(i)-(ii).

¶ 30        A finding of parental unfitness will not be disturbed unless it is against the manifest weight of the evidence, meaning, "the opposite conclusion is clearly evident" or "the determination is unreasonable, arbitrary, or not based on the evidence presented." *In re D.F.*, 201 Ill. 2d 476, 498 (2002). We may affirm "where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11. Because we conclude the trial court's finding that Brianna failed to make reasonable progress is not against the manifest weight of the evidence, we address only ground (m).

¶ 31        "Reasonable progress" requires objective "measurable or demonstrable movement toward the goal of reunification." *In re J.A.*, 316 Ill. App. 3d 553, 565 (2000). Reasonable progress exists when the court "can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). The "benchmark" for reasonable progress includes "the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of

other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001).

¶ 32    Brianna argues the trial court's unfitness finding is against the manifest weight of the evidence because some recommended services, such as disability services with DHS, were "never available to her." The record directly refutes this. The evidence shows Gray did everything she could to help Brianna under DHS policy to assist her. Gray collected all necessary documents for Brianna, sat with Brianna to call DHS, and provided instructions for the remaining steps. Brianna never followed through.

¶ 33    DHS aside, all other recommended services were available to Brianna. Although she completed some, her truancy and inconsistent engagement with others prevented reasonable progress in her parenting capacity. Brianna sparsely engaged in individual therapy and was unsuccessfully discharged three times. After her final discharge from Chatham in April 2024, she did not engage with a new provider until January 2025, stopped again in April 2025 when her therapist left, and did not complete another intake until June 2025. Brianna also failed to complete the NPP observation portion due to her own inconsistent visits, not because the service was not offered to her. Even in the non-observation portion, Brianna was rated below average on all but one criterion, indicating that her parenting skills remained insufficient two-and-a-half years later.

¶ 34    Brianna's limited parenting capacity also explained why she was never approved for unsupervised visitation. Her attendance at supervised visits declined sharply for reasons that were either unexplained or attributable to illnesses that did not justify months-long gaps in contact. All services were available to her; she simply failed to meaningfully engage with them consistently enough to demonstrate reasonable progress toward A.C.'s return home. We

therefore cannot say the trial court's unfitness finding was against the manifest weight of the evidence.

¶ 35    Brianna next contends the unfitness finding was improperly "decided on the hearsay word of a psychologist who delivered her unsworn, unconfronted views out of court," referring to the certified Delwe PCA and psychological evaluation, which she argues were inadmissible hearsay because they were created in anticipation of litigation. The State and A.C.'s counsel respond that Brianna forfeited this argument by failing to raise it below. Forfeiture aside, we find the trial court did not abuse its discretion in admitting these records.

¶ 36    Section 2-18(4)(a) of the Juvenile Court Act provides that certified records of hospitals and public or private agencies concerning a condition, act, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding shall be admissible as proof of that condition, act, occurrence or event. 705 ILCS 405/2-18(4)(a) (West 2024); see *In re K.I.*, 2016 IL App (3d) 160010, ¶ 46 (section 2-18(4)(a) applies to fitness hearings). This allows such records to be admitted "without the additional foundational requirements of the business records exception to the hearsay rule." *K.I.*, 2016 IL App (3d) 160010, ¶ 47. However, records prepared in anticipation of litigation are not admissible because they are not made in the regular course of business. *In re A.B.*, 308 Ill. App. 3d 227, 236 (1999). We review this issue for an abuse of discretion. *Id.* at 234.

¶ 37    The Delwe PCA and psychological assessment evaluated Brianna's capacity to parent A.C.'s older siblings with the aim of mitigating risks to the minors and recommending effective reunification services. Like family service plans, these were prepared "with family preservation and best interest of the child[ren] in mind, not with the goal of termination of parental rights." *Id.* at 236. Because the Delwe records were made to assist DCFS with services and A.C.'s siblings'

care, they were not created in anticipation of litigation. See, *e.g.*, *In re Nylani M.*, 2016 IL App (1st) 152262, ¶ 39; *In re Kenneth J.*, 352 Ill. App. 3d 967, 983-94 (2004) (parenting assessment was not prepared in anticipation of litigation because it was created with family preservation and best interests of all parties in mind); *cf In re A.P. and J.P.*, 2012 IL App (3d) 110191, ¶ 16 (records created three months after minor's injury opining that the injury resulted from abuse were made for litigation). Regardless, even if it was error to admit the records, any error was harmless. The trial court did not rely on those records, and ample independent evidence supports its unfitness finding, as outlined above. See *In re A.W.*, 2024 IL App (1st) 221700-U, ¶ 22 (admission of exhibit was harmless error where the "juvenile court did not rely on this document and there was sufficient evidence *** to support the court's findings").

¶ 38                                     B. Best Interest Determination

¶ 39         After a finding of parental unfitness, the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). We will not disturb a best interest determination unless it is against the manifest weight of the evidence. *In re Jaron Z.*, 348 Ill. App. 3d 239, 261-62 (2004).

¶ 40         In assessing best interest, the court shall consider the statutory factors, including: the child's physical safety and welfare; identity development; familial, cultural, and religious ties; sense of attachment, security, and continuity; the child's wishes and long-term goals; community ties; need for permanence; the uniqueness of the family and child; and the caregivers' preferences and willingness to provide permanency through guardianship or adoption. 705 ILCS 405/1-3(4.05) (West 2024). The court may also consider the child's relationship with the current caregiver and the emotional and psychological impact of a change in placement. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 41     While we do not question Brianna's love for A.C., "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. A.C. has lived in the same foster home since she was five days old, is strongly bonded to her foster parents, and is thriving in their care. By contrast, Brianna's visitation and service participation have been inconsistent, and she has never progressed to unsupervised parenting time. Removing A.C. from the only home she has ever known and placing her with Brianna, who has been inconsistent with visits and services and has never once had unsupervised parenting time with A.C., would not be in A.C.'s best interest.

¶ 42     Brianna also argues her due process rights were violated because, in her view, the KIND Act "removed any legislative preference for adoption over guardianship," and guardianship is the "least restrictive" means to achieve permanency. Public Act 103-1061 (eff. Feb. 5, 2025), known as the KIND Act, amended section 2-28 of the Juvenile Court Act (705 ILCS 405/2-28 (West 2024)) to remove its preference for termination over guardianship, "so that, now, the court does not need to rule out termination before considering guardianship." *In re A.M.*, 2025 IL App (1st) 250467, ¶ 69. The amendment "does not express a preference for guardianship over termination of parental rights but rather sets the two options on equal footing." *Id.*

¶ 43     Although guardianship may be "less restrictive" to Brianna's parental rights, the trial court carefully considered both options and, considering the evidence, found termination rather than guardianship to be in A.C.'s best interest. A.C. is flourishing and securely bonded to her foster parents, who provide a safe and stable home and have demonstrated a commitment to maintaining her relationships with her siblings and Brianna. On this record, the court's determination was not against the manifest weight of the evidence and did not violate Brianna's due process rights.

¶ 44                                                    III. CONCLUSION

¶ 45           For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 46           Affirmed.